MICHAEL C. BAUM (SBN 65158)
E-Mail: mbaum@rpblaw.com
ANDREW V. JABLON (SBN 199083)
E-Mail: ajablon@rpblaw.com
RESCH POLSTER & BERGER LLP
9200 W. Sunset Boulevard, Ninth Floor
Los Angeles, California 90069-3502
Telephone: 310-277-8300
Facsimile: 310-552-3209

Attorneys for Plaintiff Lauren Moshi, LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| LAUREN MOSHI, LLC., a California limited liability company,<br><br>              Plaintiff,<br><br>       vs.<br><br>DANIEL FUENTES, an individual doing business as both LETHAL AMOUNTS and LETHAL AMOUNTS GALLERY; and DOES 1-10, inclusive,<br><br>              Defendants. | Case No.  2:18-cv-06725<br><br>**COMPLAINT FOR:**<br><br>**1.  DECLARATORY RELIEF;**<br><br>**2.  CANCELLATION OF REGISTRATION NO. 4263931** |

1. Defendant Daniel Fuentes dba Lethal Amounts and Lethal Amounts Gallery ("**Lethal**") operates an art gallery in Los Angeles, and incidental to that business, sells a limited variety of apparel products embellished with certain designs including a "LA" (the common abbreviation for Los Angeles) using the image of two (2) common safety pins configured into the letters L and A.  Lethal has registered this as a purported trademark.

2. This Complaint for Declaratory Relief is necessitated by Lethal's wrongful effort to use the very limited trademark rights, if any, he may have into a broad appropriation of artistic and first amendment rights of others to preclude permissible uses by them of artistic expression using safety pins and the

629851.3

unprotectable geographic designation of "LA" as part of that artistic expression.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1338, and 2201 as a declaratory judgment action arising under the Lanham Act, 15 U.S.C. § 1051, *et seq.*

## GENERAL ALLEGATIONS

4.     Plaintiff Lauren Moshi, LLC ("**Plaintiff**" or "**Lauren Moshi**") is a California limited liability company with its principal place of business in this judicial district.

5.     Plaintiff's business model is not typical for apparel manufacturers. Most apparel manufacturers will purchase a print design and then attempt to sell as many garments as possible with that design.  Plaintiff takes a broader view of its brand, creating a demand for its products by creating unique pieces that are meticulously crafted in limited quantities and which are embellished with original art created by Lauren Moshi, one of the founders of Plaintiff.  Every mark, every line on every piece is an original work of art which is hand drawn by co-owner Lauren Moshi such that each garment is an embodiment of the original artwork. Similar to an artist creating demand by building a reputation of limited run of lithographs, such that the scarcity drives price of both the specific limited-edition and the artists' works as a whole, Plaintiff limits the number of garments it produces with any one of its designs.

6.     Plaintiff is the owner of, among others, Trademark Registration No. 3526753 for the word mark "Lauren Moshi", as well as Registration No. 4738966, for the Lauren Moshi signature:



7.    The word mark and/or signature mark (collectively the "**MOSHI Marks**") are for International Class 25, are incorporated into Plaintiff's designs.

8.    Additionally, Lauren Moshi, among other things, is well known for her use of skulls in her artwork and apparel.  This includes skulls as the primary motif (e.g., Examples 1 – 3), skulls morphed with other objects (Example 4), and skulls incorporated into other objects (Example 5 and 6), as shown below:



**(Example 1)**



**(Example 2)**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**(Example 3)**



**(Example 4)**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**Example 5**



**Example 6**

9.      Defendant Lethal is, on information and belief, the owner of the Trademark Registration No. 4263931 (the "**Registration**") for the stylized text "LA" spelled out with safety pins (the "**PIN Mark**"), as depicted below:



10.     Lethal's Registration is for International Class 25, and specifies that as of the date of the registration, Lethal was using the Mark for "Caps; Cloth bibs; Hats; Jackets; Shirts; Sweaters; Sweatshirts; Undershirts; Underwear."

11.     Lethal's Registration, however, includes the express disclaimer, required as a condition of registration, that "[n]o claim is made to the exclusive right to use "LA" apart from the mark as shown", meaning that the Registration affords no limitations on others use of the letters "LA".  Attached hereto as Exhibit "A" is a true and correct copy of the Registration granted by the United States Patent and Trademark Office ("**USPTO**").

12.     Lethal is not the first person to have used safety pins to form letters as part of a trademark.  For example, in 1990, Registration No. 1630182 was filed by "Pin-Pourri", using safety pins to spell out the work "Pin":



13.   Earlier, in 1966, Charles Pindyck, Inc. used the ring of a safety pin to form the "P" in the company name:



And even earlier, in 1939, straight pins were used by David Kahn, Inc. to spell out the company's name, "Needlepoint":



There are, quite simply a litany of companies that have replaced letters with either safety pins, or other sewing implements, in their logos:



**"One Change At A Time"**



**"Baby Fat Jack"**



**"Cuna"**



**"Pin Point Style"**



**"Green Tex"**                              **"Only Maken**

14.  Of course, Lethal's Registration itself presents, at best, an extraordinarily "thin" or limited registration in light of: (1) the exclusion of the letters "LA" from protection by the registration; (2) the extensive use of other items being used to form an "LA" symbol, both pre and post-dating Defendant's claimed first use; and (3) the fact a trademark cannot be granted – and here was expressly disclaimed – for a geographic area designation (i.e., "LA").

15.     By way of example, Trademark Registration No. 3795664, which was filed in 2009 by Tina Kataoka  and asserts first use in commerce in 1995 (i.e. 15 years prior to the alleged first use of the PIN Mark, is for an LA symbol made out of gloved hands:



16.     Hands forming the LA symbol have also been routinely used in artwork, such as by Estevan Oriol, in his 1995 LA Fingers photograph (that has also been reproduced on apparel):



17.     Similarly, the use of safety pins in art, generally and in connection with apparel, is common place.  The use of safety pins in art, especially in apparel, dates

back to the late 1970's with the growth of the "punk rock" scene.  Although now seen almost as a fashion trope, fashion historian Shaun Cole of the London College of Fashion has noted that: "Although punk – and this is a simplification – began as a free expression in style and music, it quickly became codified, and the safety pin became one of the elements that signified punk."  Perhaps one of the earliest, and most famous, use of safety pins on apparel can be seen in the 1977 music video for The Sex Pistols' "God Save the Queen," where lead singer Johnny Rotten wears a grubby white long-sleeved shirt held together with a series of safety pins:



18.    Safety pins and apparel were not, however, limited to punk rock singers and aficionados.  Quite to the contrary, the use of safety pins went "mainstream" almost immediately.

/ / /

/ / /

/ / /

/ / /

19.    Some of the more famous examples include Stephen Sprouse's 1987 safety pin dress:



and actress Liz Hurley's 1994 Versace Gown, slashed open along the torso and held together with oversized, golden safety pins:



20. The trend of safety pins as a design element in the fashion industry has continued today. This includes the use of physical safety pins re-imagined as accessories, like earrings and rings:





As well as incorporating safety pins into other images, such as:



21.     Images of safety pins on their own are also commonly incorporated in to apparel design.  For example:




1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

resch polster & berger llp







22.    Plaintiff has continued to build on this history of safety pins in apparel design through its copyrighted works.  As shown below, in addition to utilizing safety pins to create symbols (such as the geographic designator "NY", and an eagle), Plaintiff incorporates gothic skull imagery.



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

629851.3

1

## THE DISPUTED ARTWORK

2      23.     Plaintiff is the author of the original design incorporating safety pins

3  forming an "LA" symbol, *and* utilizing both skulls *and* its trademarked Lauren

4  Moshi signature (the "**SKULL PINS Design**"):

5

6

7

8

9

10

11

12



13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

24.     A close up of the bottom skull incorporating the trademarked Lauren Moshi signature is shown below:



/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

25.     Plaintiff created the SKULL PINS Design, and has used it as a design on apparel.  Plaintiff has a Copyright Registration (VA 2-104-704) for the SKULL PINS design.  The design appears in conjunction with the geographic designation for Los Angeles on the reverse side of the garment (akin to the NY Skull Pin design shown above):



26.     The SKULL PIN Design is intended to convey, among other things, the artists expression of Los Angeles, as a geographic area, which is edgy, part of both the punk rock and fashion scene, and the interplay between the two worlds.  It is used as an artistic embellishment, and, except for the Lauren Moshi signature embedded in the skulls, is not being used as an identifier of the source or origin of the product.  The SKULL PIN Design is art, <u>not</u> a trademark.

27.     Interestingly, Lethal utilizes trademarked images belonging to third parties in his own artistic expression.  For example, Lethal offers for sale a t-shirt

1   that has an image of Walt Disney's Mickey Mouse shooting himself through the

2   back of the head, with the resulting blood spray forming the PIN Mark:



16   28.   On July 26, 2018, Plaintiff received a cease and desist letter (the

17   "**Demand Letter**") from counsel for Lethal, a copy of which is attached hereto as

18   Exhibit "B".

19   29.   The Demand letter asserts that Plaintiff's use of its copyrighted SKULL

20   PINS Design infringes upon the PIN Mark, and specifically that the use of the

21   design "constitute[s] trademark/trade dress infringement, unfair competition, false

22   designation of origin, trademark/trade dress dilution and blurring, and copyright

23   infringement."   Although providing a trademark registration number for the PIN

24   Mark, the Demand letter does not identify any copyright registration number and it

25   does not appear that the PIN Mark is registered with the US Copyright office.

26   / / /

27   / / /

28   / / /

## **FIRST CLAIM FOR RELIEF**

### **(Declaratory Relief)**

30.     Plaintiff hereby incorporates by reference and realleges each of the allegations of Paragraph 1 through 27, inclusive.

31.     Lethal has asserted that Plaintiff's use of the copyrighted SKULL PIN Design infringes upon Defendant's PIN Mark.

32.     Plaintiff disputes that its copyrighted SKULL PIN Design infringes the PIN Mark.   Plaintiff further disputes that its copyrighted SKULL PIN Design "constitute[s]. . .unfair competition, false designation of origin, trademark/trade dress dilution and blurring, [or] copyright infringement."

33.     The Lanham Act is not applicable to Plaintiff's copyrighted SKULL PIN Design because, among other things: (1) there is no likelihood of confusion; and (2) Plaintiff's copyrighted SKULL PIN Design at all times <u>not</u> used as a trademark and was instead used as an expressive work of art embellished on a garment that bore – in addition to the Trademarked Lauren Moshi signature – hangtags and labels clearly designating Plaintiff as the source of the goods bearing the SKULL PIN Design.   Plaintiff's copyrighted SKULL PIN Design is an expressive work or art protected by the First Amendment.

34.     Plaintiff's copyrighted SKULL PIN Design is not a copy of Defendant's PIN Mark.   Defendants PIN Mark does not give Defendant any protectable rights in the use of safety pins to form letters signifying the abbreviation for a geographic region, namely Los Angeles or "LA" and as noted such rights are specifically disclaimed in the trademark granted to Defendants.

35.     The use of safety pins, and the geographic designator "LA", is artistically relevant to Plaintiff's copyrighted SKULL PINS Design, and their use does not "*explicitly* mislead[] consumers as to the source or the content of the work." *Gordon v. Drape Creative, Inc.*, No. 16-56715, 2018 WL 3613961, at *4 (9th Cir. July 30, 2018) (emphasis added).   Plaintiff's combination of punk rock,

gothic motifs of skulls and pins fancifully combined to show the geographic designation for Los Angeles is an artistic expression and not a trademark designation of source or original of product. Accordingly, any claim of trademark infringement, false designation of origin, or trademark/trade dress dilution and blurring fails as a matter of law.

36. With respect to the claim of Copyright infringement, Plaintiff disputes that Lethal is the owner of a legally valid copyright in the PIN Mark, and disputes copying of the same. Moreover, Plaintiff asserts that the doctrine of *scenes a faire* prohibits any finding of Copyright infringement.

37. Accordingly, an actual controversy has arisen and now exists between Plaintiff and Defendant concerning their respective rights and duties.

38. Plaintiff requires a judicial determination of the parties' rights and duties and a declaration that the SKULL PIN Design does not infringe upon Defendant's PIN Mark, and that its use does not "constitute trademark/trade dress infringement, unfair competition, false designation of origin, trademark/trade dress dilution and blurring, and[/or] copyright infringement."

39. A judicial determination is necessary and appropriate at this time so that Plaintiff may ascertain its rights and duties with respect to the subject mark, should be made in accordance with Plaintiff's contentions as set forth above.

## SECOND CLAIM FOR RELIEF

### (Cancellation Of Registration 4263931)

40. Plaintiff hereby incorporates by reference and realleges each of the allegations of Paragraph 1 through 27, inclusive.

41. As noted above, Lethal's Registration is for International Class 25, and specifies that as of the date of the registration, Lethal was using the Mark for "Caps; Cloth bibs; Hats; Jackets; Shirts; Sweaters; Sweatshirts; Undershirts; Underwear."

42. Contrary to the representations made by Daniel Fuentes under penalty

of perjury, as of the date of the registration, use of the PIN Mark was limited to Hats, Shirts, and Sweatshirts.

43.    Defendant knew at the time of filing that he was not using the PIN Mark in connection with Cloth bibs, Jackets, Sweaters, Undershirts or Underwear, yet fraudulently included such representation in his application in an effort to deceive the USPTO into issuing a registration covering a larger swath of goods than were actually in use.  Defendant still has not used the PIN Mark for all goods identified on its application.

44.    The above constitutes fraud on the USPTO and constitutes grounds for cancellation of the PIN Mark.

45.    Furthermore, as a separate an independent basis for cancellation of the PIN Mark, the PIN Mark reflects a generic use of items to form the letters "LA" and, as such, is not subject to protection as a trademark.

46.    In addition to the examples set forth above, Lethal itself – without using any source designator – offers for sale a t-shirt bearing the letters "LA" that are spelled out using bats:



47.    Moreover, the fashion company BCBG Max Azaria previously used safety pins to form the letters "LA" on a garment:



48.    Simply put, by virtue of the generic nature of the mark, the widespread use by others of safety pins to form letters, and Plaintiff's own dilution of his claimed mark, the PIN Mark lacks distinctiveness and is generic.

WHEREFORE, Plaintiff respectfully requests that a judgment be entered in its favor and against defendants as follows:

**First Claim for Relief**

1.    Declaring that Plaintiff's copyrighted SKULL PIN Design does  not infringe upon the PIN Mark, or constitute trademark/trade dress infringement, unfair competition, false designation of origin, trademark/trade dress dilution and blurring, or copyright infringement.

2.    For costs of suit, including attorneys' fees to the maximum extent allowable by laws; and

3.    For such further and other relief as the Court deems just and proper.

**Second Claim for Relief**

1.    For cancellation of Registration No. 4263931;

2.    For costs of suit; and

3.    For such further and other relief as the Court deems just and proper.


Dated: August 6, 2018                    RESCH POLSTER & BERGER LLP


By:    _____/s/ Michael C. Baum_____
                    MICHAEL C. BAUM
                    ANDREW V. JABLON
        Attorneys for Plaintiff Lauren Moshi, LLC